UNITED STATES of America,

v.

**John F. BOOKOUT, Defendant.**

**Crim. No. L–90–779M.**

United States District Court,
S.D. Texas,
Laredo Division.

March 31, 1992.

David Almaraz, Laredo, Tex., for defendant.

Mark Dowd, Asst. U.S. Atty., Laredo, Tex., for Government.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOTZON, United States Magistrate Judge.

Defendant is charged with violation of 16 U.S.C. §§ 703–711 and 18 U.S.C. § 2. Because the Court is not persuaded that the Government has discharged its burden in this case, the Court FINDS the Defendant, JOHN F. BOOKOUT, NOT GUILTY.

## FINDINGS OF FACT

The Defendant consented, in writing, to trial before this Court on October 23, 1990, and waived his right to have this case tried before the District Court. Therefore, this Court has jurisdiction over this matter.

The charges made by the Government relate to events which took place during a hunting vacation in September of 1990. The Defendant was one of several persons invited to hunt birds on the "UNO MAS" ranch in La Salle County, Texas, on the weekend of September 22, 1990. The Defendant is accused of knowingly hunting mourning doves over a baited field, exceeding the daily bag limit for such birds, failing to properly tag birds which he killed and left in the possession of another, and aiding and abetting the taking of an American Kestrel on September 22, 1990.[1]

A trial was held on December 20, 1991, regarding these charges. The testimony at that trial established the following facts.

*Hunting over bait:*

■ There was uncontroverted testimony by Agent Jim Steinbaugh, Senior Resident Agent for the United States Fish and Wildlife Service, that the party of which the Defendant was a part had been hunting in the area around a "tank" on the UNO MAS ranch. This "tank" is a man made lake on the property which is surrounded by a large levee. Atop the levee runs a dirt road which connects the "tank" with the rest of the ranch. There is also a dirt road running below the levee which circumnavigates the "tank" and connects with the other ranch arteries. Testimony from agent Steinbaugh, as well as evidence introduced by the Government in the form of photographs and bait samples, establish that the road which sits on top of the levee was, indeed, scattered with corn and milo grains. This mixture of grains will attract mourning doves as well as many other forms of wildlife for which baiting is legal such as deer, quail, turkey, and other indigenous birds. None of the Government's exhibits show mourning doves eating the bait that was on top of the levee.

■ It is also uncontroverted that the Defendant was never taken across the baited road. The Defendant testified that he was taken to his hunting spot via the road which runs below the levee. He was dropped off at a place some 100 yards from the levee where he could not see its top without climbing it. Mrs. Jo Hill, the wife of the ranch's former owner, was present in the car that the Defendant rode in, and she corroborated that they never went on top of the levee. The ground where the Defendant was dropped off had no visible bait, although it was situated near a field of oats. Additionally, the Defendant testified that he was told not to stray too far from his drop off point so as to minimize the danger of a hunting accident. The Court takes judicial notice that this is a common practice among hunters to help insure that no harm will come to members of the hunting party. The Defendant was picked up near where he was left off and returned to the ranch house, again via the road which runs below the levee.

After the agents had identified themselves and had begun to question the members of the hunting party, including the Defendant, he was informed that he was suspected of hunting over bait. The Defendant denied this allegation and offered to return with the officers to his hunting site so that they could see the area for themselves. No officer ever returned to the Defendant's hunting spot either accompanied by him or by themselves.

*Exceeding the Daily Bag Limit:*

■ The Defendant testified that he could not give a firm number as to how many birds he had shot. He was certain that he had shot ten (10) birds at which point he stopped count. However, he was certain that he only shot two more times

---

**1.** The mourning dove is a member of the pigeon family whose name derives from its plaintive song. In 1980, its population, in North America alone, was estimated to be 400 million. An American Kestrel, unlike the *avis vugla* mourning dove, is an endangered species. This *avis rara* is protected, not only by the Migratory Bird Treaty Act but by the Endangered Species Act as well. *See e.g., United States v. Van Fossan,* 899 F.2d 636, 637 (7th Cir.1990); 16 U.S.C. § 703 et seq. (1992); 16 U.S.C. § 1538 et seq. (1992).

after he quit counting the birds he had killed. The reason given by the Defendant for his inability to be certain how many kills he had registered was that he was not sure if his last two shots had found their marks.

Agent Steinbaugh testified that the total number of birds taken by the hunting party was one-hundred-ten (110) mourning doves and the American Kestrel. He could not say, however, which hunters shot which birds, or the exact number shot by each hunter. No agent for the Government ever counted the birds shot by the petitioner as they had already been commingled with other birds by the time the agents took possession of them.

*Failure to Tag:*

■ The Defendant was aided by a "bird boy" while he was hunting. The bird boy would retrieve the birds as the Defendant killed them. The birds would be placed in a bucket that the bird boy had brought with him from the ranch house. Only the Defendant's birds were placed in this particular bucket. Some others in the hunting party shared a bucket, but the Defendant did not. When the day's shoot was concluded, the Defendant left the bucket, containing his birds, in the possession of the bird boy who was to take the birds back to the ranch for the Defendant. Mrs. Hill stated that it was the practice of the ranch for the bird boys to bring the birds in from the field as a courtesy to their guests. The Defendant did not tag the birds when he left them in the possession of the bird boy.

*Aiding and Abetting:*

■ The record shows that the American Kestrel was killed by John Hill, the ranch owner at the time of the incident. Apparently, the shooting was accidental. The Defendant testified that he did not see the Kestrel shot nor did he shoot the Kestrel. None of the Government witnesses could place the Defendant at or near the site where the Kestrel was shot. Neither could any Government witness testify that the Defendant even knew that the Kestrel had been shot until he was informed by the agents.

## CONCLUSIONS OF LAW

The Court will discuss each of the charges against the Defendant in the order in which they appear above.

*Hunting Over Bait:*

16 U.S.C. § 703 makes it illegal to take, kill, or possess a migratory bird except as provided by law. Mourning Doves (*Zenaida macroura*) are listed as migratory birds under 50 C.F.R. § 10.13. 50 C.F.R. § 20.21(i) makes it illegal to take migratory birds over a baited area. Bait, as it is used in this section, refers to the type of grains which were spread atop the levee at the UNO MAS ranch. 50 C.F.R. § 20.21(i).

The Fifth Circuit interpreted 50 C.F.R. § 20.21 in *United States v. Delahoussaye,* 573 F.2d 910 (5th Cir.1978). *Delahoussaye* involved duck hunters in Louisiana that hunted ducks over bait and electronic callers. The bait and callers were situated on property that abutted the hunting area and which was not owned by any of the hunters. The court held that there is a knowledge component in 50 C.F.R. § 20.21. This component requires that at, "a minimum the bait or callers must have been so situated that their presence could reasonably have been ascertained by a hunter properly wishing to check the area of his activity for illegal devices." *Delahoussaye,* 573 F.2d at 912. The court went on to note:

[t]here could be no justice for example, in convicting one who was barred by a property line from ascertaining that birds were being pulled over him by bait or callers hidden from his view, and we decline to impute such an intent to the regulations. One mallard sounds like another, or even like a duck call, and the fact that a hunter hears quacking next door does not tell him that callers are in use there. The same is true of bait; standing crops attract game quite as well as bait does, and hunting over standing crops is expressly permitted by another portion of the regulations not quoted. If the hunter cannot tell which is the means next door that is pulling birds over him, he cannot justly be penalized. Id.

In the case at bar, there can be no question that the Defendant had no actual knowledge of the bait on top of the levee. Both his testimony and that of Jo Hill show that he was never taken on top of the levee. None of the Government witnesses can place him on top of the levee. Therefore, the only reasonable conclusion is that the Defendant had no actual knowledge of the bait on top of the levee. The only question then is; should he have known that the area was baited? The Court is persuaded that this question is answered in the negative.

■ The Government attempted to show that the Defendant should have been put on notice that there was illegal bait because the birds continued to come over the hunting area after the shooting had begun. The Government's theory is, apparently, that only the presence of bait could have tempted the birds to keep flying into such an obviously dangerous area. Setting aside the question of the relative intelligence of mourning doves, the Court takes judicial notice of the fact that mourning doves, indeed most wildlife, go to water at certain times each day. This hunt took place in the late afternoon-early evening; about 5:00 to 6:00 p.m. This is the time that the birds will go to water. They will go where they know water may be found; usually where they have found it before. To an experienced hunter, there would be nothing strange about a scenario where no birds were seen all day, and then hundreds could be seen in a short time in the late afternoon; even after shooting begins. It is the opinion of the Court that the fact that doves continued to fly within range of the hunters guns, even after the shooting had begun, is insufficient to put the Defendant on notice that illegal bait was being used outside his field of view.

This conclusion is particularly true when one considers that the Defendant was told, as is customary, not to stray far from his drop off point in order to avoid being accidentally shot by other hunters in the party. It would have been nothing short of foolish for the Defendant to climb the levee to inspect it for illegal bait when the entire party was shooting birds flying over that levee.

The Defendant's uncontroverted testimony is that bait was not visible on the ground where he was hunting. The Government did not show that there was any bait in the area that the Defendant was located. There was a field of oats nearby which is not considered illegal baiting. The mourning doves did not display any unusual activity in going to a watering spot at the time of the hunt. For his own safety, the Defendant was told not to, and should not have, strayed far from his drop off site. All of these factors lead the Court to conclude that there is no reasonable basis for the Defendant to know that the top of the levee was illegally baited. Therefore, the Government has not discharged its burden, and the Court FINDS the Defendant NOT GUILTY of this charge.

*Exceeding the Daily "Bag Limit":*

50 C.F.R. § 20.24 proscribes the taking of more birds in one calendar day than is allowed by law. This constitutes the daily bag limit. 50 C.F.R. § 20.103 sets out this daily bag limit. The limit changes from year to year depending on several factors considered by the Fish and Wildlife service. When the Defendant and his party were hunting the daily bag limit was twelve (12) mourning doves.

The Defendant's testimony is that he stopped counting after he had reached ten (10) doves killed, but that he shot only two (2) more times after he stopped count. Assuming that each of these shots hit its mark, the Defendant could not, by his testimony, have exceeded the daily bag limit of twelve.

The Government did not controvert this testimony. No Government witness either saw the Defendant shoot over his limit, or saw birds, belonging to the Defendant, which exceeded his limit. There was testimony, and the defense stipulated to the fact, that the total number of birds taken exceeded the combined limit of the hunters, but there was no testimony as to which hunters had killed more than their respective limits.

By this testimony the Government has failed to prove, beyond a reasonable doubt, that the Defendant exceeded his daily bag limit. Therefore, the Court FINDS the Defendant NOT GUILTY on this count.

*Failure to Tag:*

The Court begins this analysis by noting the paucity of cases discussing this subject. A hunter is, in certain situations, required to "tag" his birds by 50 C.F.R. § 20.36.[2] Neither the parties nor the Court has been able to find any Fifth Circuit authority interpreting this regulation. However, the Tenth Circuit, in *United States v. Ray*, 488 F.2d 15 (10th Cir.1973), has interpreted this regulation to require a hunter, "to tag his prey in four situations: When he leaves it (1) at any place other than his home; (2) in the custody of another for picking, cleaning, etc.; (3) for storage; and (4) for the purpose of having taxidermy services performed." *Ray*, 488 F.2d at 18. The *Ray* case involved duck hunters in Oklahoma that had left the previous day's take at their campsite, without tags, while hunting the next day. The court, therefore, discussed in detail the first of the four situations, leaving the prey at some place other than his home. That is not the situation presented by the case at bar.

In the present case, the Defendant is charged with violating the second of the four situations mentioned in *Ray;* leaving the prey in the custody of another. The Court has found no cases which address this issue. Therefore, the Court must interpret this section and apply it to the facts of the case at bar with no precedential guidance.

The only relevant part of 50 C.F.R. § 20.36 to the case at bar is the question of whether the Defendant gave his birds to another for transport. The birds were not to be cleaned, picked, processed, or shipped when the Defendant left them with the bird boy. He was only to return the birds to the Defendant when they reached the ranch house some ¼ mile away.

The Defendant advances the theory that he never lost possession of his birds. He argues that since the bird boy accompanied only him, and was at all times under his direction, that the birds collected by the bird boy were never out of the Defendant's possession. He argues that he at all times constructively possessed the birds citing *Johnson v. United States*, 270 F.2d 721 (9th Cir.1959). The Court is not persuaded by this informal agency theory. While it is true that there was an agreement between the bird boy and the Defendant, the Court does not believe that this agreement rose to the level of an agency. It is clear that the Defendant did deliver possession of his birds to the bird boy when he left the field, even if this delivery was only so the bird boy could take the birds back to the ranch house. In any event the answer to whether the Defendant violated the regulation does not lie in his agency theory.

Neither can it be found in the argument made by the Government. The Government cites the Court to *Ray supra,* and notes that the Defendant admits to not tagging the birds he shot. There is no further analysis. The Court can only assume that the Government's argument is that any time a hunter's birds are in the possession of another without being tagged, a violation of the regulation has occurred. The Court finds this argument over-broad. Under this theory, the Defendant was guilty of a violation when the bird boy retrieved his birds after the Defendant had shot them. The courtesy extended by the owners of the ranch, forced the Defendant to commit a crime because he allowed another to pick up a bird he had just shot and place it in a bucket at his feet before it was tagged. Hypothetically, a violation would occur, under the Government's theory, even in the following situation. If a

---

**2.** "No person shall put or leave any migratory game birds at any place (other than at his personal abode), or in the custody of another person for picking, cleaning, processing, shipping, transportation, or for storage (including temporary storage), or for the purpose of having taxidermy services performed, unless such birds have a tag attached, signed by the hunter, stating his address, the total number and species of birds, and the date such birds being killed. Migratory game birds being transported in any vehicle as the personal baggage of the possessor shall not be considered as being in storage or temporary storage." 50 C.F.R. § 20.36.

hunter is carrying his un-tagged birds (which is not a violation) and accidentally drops one, and another hunter picks that bird up to return it to him, the first hunter could be charged with failing to tag his bird before delivering it into the possession of another. Both of these situations do not seem to be contemplated by the regulation.

"[T]he purpose of the tagging requirement is to facilitate enforcement of the taking and possession limits by obliging a hunter to tag his kill *after each day's hunt* in order to distinguish it from game taken on another day or game taken by a different hunter." *Moresi v. Department of Wildlife and Fisheries, et al.*, 567 So.2d 1081 (La.1990) (emphasis added). This interpretation by the Louisiana Supreme Court seems to be more in line with the intent of the Migratory Bird Treaty Act and 50 C.F.R. § 20.36. The tagging requirement is to help preserve wildlife by ensuring that no hunter unnecessarily wastes our living resources. It is intended to identify and punish abusive hunters who slaughter wildlife for the sake of that slaughter. Such is not the case with the Defendant.

At most, the Defendant killed twelve birds on the date in question. This number is not in excess of his daily bag limit. He availed himself of a courtesy extended by his host by allowing a bird boy to aid him in collecting his kills. He was hunting on a ranch known for its variety of wildlife and excellent hosts. At no time was the party more than ¼ mile from the ranch house. The birds killed in the field were to be directly transported to the ranch house where they would be presented to the hunters who had killed them so that a final disposition of the birds could be reached. It was at that time, when the hunter was required to make a decision as to the final disposition of the birds, that any tagging should have taken place. It was not until that point that the dangers which tagging is designed to prevent were present in the case at bar.

If a hunter is going to have the birds cleaned and prepared for dinner by the ranch cook, or cleaned and prepared by a person not located on the ranch, he should tag the birds when he surrenders possession of them to be cleaned and cooked. If a hunter intends to have the birds delivered to a taxidermist, he should tag them before relinquishing possession. If a hunter is going to have the birds shipped back to his home, he should tag them before delivering them to the common carrier. If a hunter plans on using the ranch as a temporary storage site for the birds, he should tag them before he leaves on the next day's hunt. What the hunter is not required to do under the regulation is tag the birds immediately upon shooting them. What a hunter should do, however, is tag his birds after each day's hunt.

In the case at bar, the birds shot by the Defendant were seized by the agents before the time when he was required to tag them under the regulation. Since he never had an opportunity to tag his take, he cannot now be held to answer for that failure. The Government has failed to prove that the Defendant violated the regulation. Therefore, the Court FINDS the Defendant NOT GUILTY of this charge.

*Aiding and Abetting:*

As has been noted above, the Defendant did not shoot or see the American Kestrel shot while hunting on the day in question. He learned of the shooting only after the day's hunting was over. To prove aiding and abetting it must be shown that, "each defendant 'associated himself with the unlawful venture', 'participated in it as *something he wished to bring about*', and 'sought by his actions to make it succeed.' " *United States v. Lyon, et al.*, 949 F.2d 240, 242 (8th Cir.1991) (citations omitted) (emphasis added). The Government has not discharged this burden.

Although it can be said that the Defendant "associated himself" with this unlawful venture by being a member of the hunting party, none of the other elements of the above test are present. Since the shooting of the Kestrel itself was accidental, the Defendant, who it must be remembered had no knowledge of this violation at the time, cannot be said to have wished to bring about this outcome. There was no

testimony that a goal of the hunting party was to kill a Kestrel. Neither was there testimony that the Defendant pointed out the location of the Kestrel to the hunter who shot it, or aided that hunter in *any* way. In short, the Government has not proven, beyond a reasonable doubt, that the Defendant, 1) associated with the illegal activity, 2) wished the Kestrel to be shot, and 3) through his actions made the death come about. Therefore the Court FINDS the Defendant NOT GUILTY of this charge.

## CONCLUSION

Because the Court has found the Defendant, JOHN F. BOOKOUT, NOT GUILTY of all charges pending against him, the Court will enter an ORDER of acquittal.